UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11bk38875 |
| | ) | |
| Kimberly A. Littman | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| Susan K. Cervac, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Case No. 12ap00155 |
| v. | ) | |
| | ) | |
| Kimberly A. Littman | ) | Judge Timothy A. Barnes |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The matter before the court is the Second Motion to Vacate Judgment and for Leave to File Response to Cervac's Summary Judgment Motion (the "Motion to Vacate") brought by debtor Kimberly A. Littman (the "Debtor") seeking relief from the court's Order Granting Plaintiff's Motion for Summary Judgment (the "Order Granting Motion") and Rule 7058 Judgment Order (the "Judgment Order" and collectively with the Order Granting Motion, the "Orders") under Rules 59 and 60 of the Federal Rules of Civil Procedure (the "Civil Rules") on the grounds that the underlying state court judgment has been satisfied. The matter before the court is whether and if so, to what extent, this court should set aside its previous grant of summary judgment in favor of Susan Kathleen Cervac (the "Plaintiff") in adversary proceeding no. 12ap00155 (the "Adversary").

In short, the Debtor argues under Civil Rules 59 and 60 that the court's grant of an unopposed motion for summary judgment was procedurally inappropriate given the existence of an affirmative defense of satisfaction of the obligation set forth in the Debtor's answer. Further, the Debtor asserts arguments under Civil Rule 60(b)(5) based, essentially, on accord and satisfaction. The latter matter is not a typical, to the extent there is a typical, Civil Rule 60(b)(5) proceeding. This is primarily because the Debtor argues that the state court judgment upon which this court's Orders were predicated was satisfied, at least in part, *before* that state court judgment was entered.

Upon a review of the parties' respective filings and after holding a three-day evidentiary hearing on the matter, the court finds that the Debtor has failed to establish grounds to set aside or modify the Orders. Accordingly, the Motion to Vacate is denied.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding for determination of the dischargeability of a particular debt may only arise in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(B) and (I); *Birriel v. Odeh (In re Odeh)*, 431 B.R. 807, 810 (Bankr. N.D. Ill. 2010) (Wedoff, J.); *Baermann v. Ryan (In re Ryan)*, 408 B.R. 143, 151 (Bankr. N.D. Ill. 2009) (Squires, J.).

It follows, therefore, that motions for relief under Civil Rules 59 and 60 relating to the foregoing are also core proceedings. 28 U.S.C. § 157(b)(1) & (2). Accordingly, final judgment is within the scope of the court's authority.

## BACKGROUND

This is a dispute between sisters, the Plaintiff and the Debtor, over the assets of their deceased mother's estate. Prior to the commencement of the Debtor's chapter 7 bankruptcy case, an action in the Illinois courts (the "State Court Action") resulted in the entry of an agreed judgment order (the "State Court Judgment") providing for restitution to the Plaintiff for funds that the Debtor had improperly disbursed from their mother's estate, a loan that the Debtor had failed to repay to the Plaintiff and fees related thereto.

The State Court Judgment also provided that the Debtor would make total restitution to the Plaintiff within two years of its entry. On September 24, 2011 (the "Petition Date"), just short of the two-year anniversary of the State Court Judgment and thus prior to the two-year restitution deadline set forth therein, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. In that petition, the Debtor listed the Plaintiff as the holder of a disputed claim.

Thereafter the Plaintiff commenced the Adversary. The circumstances regarding this court's grant of summary judgment in favor of the Plaintiff in the Adversary and the present Motion to Vacate are discussed in detail, below.

## PROCEDURAL HISTORY

In considering these matters, the court first reflects upon the procedural posture of the matter. In the first instance, this matter arises out of an adversary complaint (the "Complaint")

2

[Docket No. 1][1] dated January 31, 2012, wherein the Plaintiff sought to have a $49,541.60 claim against the Debtor resulting from the State Court Judgment deemed nondischargeable under 11 U.S.C. § 523(a)(2), (4) and (6).

The Debtor, who was initially represented by counsel other than those presently before the court in the Adversary, answered the Complaint with the assistance of that prior counsel on May 31, 2012 (the "Answer") [Docket No. 17]. Prior counsel continued to represent the Debtor in the matter for a period of time thereafter, including in a series of status hearings on the Adversary and two motions to dismiss filed by the prior counsel.

On April 3, 2013, after the court denied the Debtor's second motion to dismiss the Adversary, the court authorized the withdrawal of the Debtor's prior counsel and, in so doing, expressly advised the Debtor both of her *pro se* status and that she must comply with all procedural rules and deadlines. In that order, the court stayed proceedings for 21 days for the Debtor to obtain replacement counsel if she so desired. The Debtor, instead, elected to proceed *pro se*.

Nearly four months later and after a series of additional status hearings, the Motion of Plaintiff, Susan Kathleen Cervac, for Summary Judgment (the "Summary Judgment Motion") [Docket No. 48], was filed on August 7, 2013. The court thereafter conducted an initial hearing on August 20, 2013 on the Summary Judgment Motion which was attended by both parties, where the court set briefing deadlines and again cautioned the Debtor that her compliance was required. Nonetheless, the Debtor failed to file any response to the Summary Judgment Motion.

On October 15, 2013, at a hearing following the conclusion of the briefing schedule, neither the Debtor nor any replacement counsel for the Debtor appeared. At that hearing, the court considered the merits of the Summary Judgment Motion and documents filed in support thereof, the Complaint and the Answer and ruled in favor of the Plaintiff on some, but not all, of the relief requested in the Summary Judgment Motion, thereafter entering the Orders. All remaining counts other than those on which summary judgment had been granted were dismissed.

The following day, and prior to the entry of the Orders, the Debtor's newly retained and present counsel appeared in the Adversary. After the Orders were entered on October 17, 2013, on October 18, 2013, the Debtor's new counsel promptly moved to vacate the nondischargeability judgment, alleging that the Debtor's excusable neglect as a *pro se* litigant warranted relief from the Orders.

The court, after relying on the well-established precedent in the Seventh Circuit that the deference extended to *pro se* litigants does not include an abrogation of deadlines[2] and the court's express and repeated warnings to the Debtor to comply with the deadlines, and finding that the

---

[1]      Unless otherwise noted, all docket references contained herein are to the Adversary.

[2]      *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996) ("[B]eing a pro se litigant does not give a party unbridled license to disregard clearly communicated court orders. It does not give the pro se litigant the discretion to choose which of the court's rules and orders it will follow, and which it will willfully disregard."); *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994) ("[P]ro se litigants are not entitled to a general dispensation from the rules of procedure or court-imposed deadlines.").

Debtor's explanation for missing the deadline did not to establish excusable neglect, denied the Debtor's first motion to vacate.

Shortly thereafter, and still within the time period to seek both Civil Rule 59 and Rule 60 relief,[3] the Debtor asserted a new request to vacate or modify the Orders by filing the Motion to Vacate. Thereafter, the Debtor appealed the Orders.

In considering the Motion to Vacate, the court has considered the evidence and argument presented by the parties at the three-day evidentiary hearing that took place on March 11, 2014, March 12, 2014 and March 19, 2014 (the "Hearing"), has reviewed the Motion to Vacate [Docket No. 65], the attached exhibits submitted in conjunction therewith, and has reviewed and found each of the following of particular relevance:

(1)    The Complaint;

(2)    Debtor's Answer;

(3)    Summary Judgment Motion;

(4)    Memorandum of Law of Plaintiff, Susan Kathleen Cervac, in support of Motion for Summary Judgment [Docket No. 54];

(5)    Judgment Order [Docket No. 60];

(6)    Order Granting Motion [Docket No. 61];

(7)    Littman's Motion to Vacate Judgment and for Leave to File Response to Cervac's Summary Judgment Motion [Docket No. 63];

(8)    Kimberly Littman's Supplement to her Second Motion to Vacate Judgment and for Leave to File Response to Cervac's Summary Judgment Motion [Docket No. 80];

(9)    Plaintiff's Response to Defendant's Second Motion to Vacate Judgment and Defendant's Supplement [Docket No. 89];

(10)    Kimberly Littman's Reply in Support of her Second Motion to Vacate Judgment and for Leave to File Response to Cervac's Summary Judgment Motion [Docket No. 91];

---

[3]    Civil Rule 59 is made applicable in cases under the Bankruptcy Code by Bankruptcy Rule 9023.  Fed. R. Bankr. P. 9023.  Bankruptcy Rule 9023, however, requires that relief sought under Civil Rule 59 be brought within 14 days, not the 28 days contained in Civil Rule 59 itself.  *Id.*

Civil Rule 60 relief is made applicable in cases under the Bankruptcy Code by Bankruptcy Rule 9024. Fed. R. Bankr. P. 9024.  Bankruptcy Rule 9024 does not alter the time frame for seeking Civil Rule 60(b) relief in bankruptcy cases. Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.").

(11)   Plaintiff's Sur-Reply to Defendant's Reply to Plaintiff's Response to Defendant's Motion to Vacate Judgment and Defendant's Supplement [Docket No. 95];

(12)   Littman's Motion for Leave to Reopen her Case-in-Chief [Docket No. 115];

(13)   Littman's Proposed Findings of Fact and Conclusions of Law [Docket No. 116];

(14)   Plaintiff's Proposed Findings of Fact and Conclusions of Law [Docket No. 119];

(15)   Plaintiff's Response to Defendant's Post Trial Brief [Docket No. 121];

(16)   Littman's Motion for Leave to File a Reply Brief [Docket No. 123]; and

(17)   Order Denying Defendant's Motion for Leave to File a Reply Brief [Docket No. 124].

Though the foregoing items do not constitute an exhaustive list of the filings in the Adversary Proceedings the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi*, No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (authorizing a bankruptcy court to take judicial notice of its own docket).

## EVIDENTIARY RULINGS

At the Hearing, the majority of the evidence offered by the Debtor related to her theory that the State Court Judgment had been satisfied. The court took certain objections to evidence presented under advisement.

The first type of objection remaining open at the end of the Hearing related to alleged expert valuations of personal property (the "Property") that the Debtor had transferred (the "Transfer") to the Plaintiff. These objections were, however, mooted by the Debtor's decision not to produce her expert for cross-examination and not therefore to introduce the expert's valuations into evidence. These objections are overruled as such.

The second type of objection remaining open was as to the admission of certain evidence regarding the value of the Property. After considering these objections, it is the court's determination that the objections must be sustained.[4]

To put a finer point on it, the Debtor initially testified as to her opinion as to the value of the Property. Tr. 72-90, Mar. 11, 2014. That testimony was formed largely based on internet and other research, Tr. 73, 82-83, Mar. 11, 2014, and in part summarized in and in part formed by an Excel spreadsheet, DX 1, that had been prepared primarily by Edward Peck ("Peck"), a third-party who testified that he was in a relationship with the Debtor. Tr. 134, Mar, 11, 2014. The Plaintiff

---

[4]     In light of the court's ruling on the legal issues raised at trial and discussed later in this Memorandum Decision, these evidentiary rulings are not necessarily outcome-determinative. *See infra.*

objected to both the Debtor's testimony and to the admission of the spreadsheet. The Debtor, apparently seeking to establish the foundation for the spreadsheet, then offered the testimony of Peck, who testified that he had prepared the spreadsheet based in part on the Debtor's recollection, but primarily based on his own internet research. Tr. 140-142, Mar. 11, 2014 ("70% of this list was further research done by me."). Again, the Plaintiff objected. These objections raise the question of both the Debtor's and Peck's lay opinion as to value, as well as the admissibility of the spreadsheet.

Layperson opinion is expressly limited by the Federal Rules of Evidence (the "FRE"'s). Opinion is generally the province of experts. *See* FRE 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise ...."). Lay witnesses may offer opinion testimony under FRE 701, however, which provides that "a lay witness giving opinion testimony may only give opinion testimony which is rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or a determination of a fact in issue." *In re Syed*, 238 B.R. 133, 144 (Bankr. N.D. Ill. 1999) (Schmetterer, J.); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 507 U.S. 579, 592 (1993) ("Unlike an ordinary witness, see FRE 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

The Seventh Circuit has stated that "[t]he difference between an expert witness and an ordinary witness is that the former is allowed to offer an opinion, while the latter is confined to testifying from personal knowledge." *United States v. Williams*, 81 F.3d 1434, 1442 (7th Cir. 1996). While the latter is also an opinion, *see* FRE 701, as the Seventh Circuit has made clear, when a lay witness testifies as to an opinion which is based on a specific source other than the witnesses perception (*e.g.*, research, another's opinion, etc.), that testimony does not qualify for admission under FRE 701. *Weinberger v. AnchorBank, FSB*, No. 10-C-0996, 2011 WL 679343, at *3 (E.D. Wis. Feb. 16, 2011) ("[I]t would be impermissible hearsay to allow a lay witnesses to testify to the results of his internet searches and his review of pricing guides.").

Viewed in light of the foregoing, even though FRE 701 speaks to "Opinion Testimony by Lay Witnesses," it is not the same kind of opinion as that offered by the experts normally for testimony as to value. Nonetheless, FRE 701 is often used to permit owners of property to testify as to their opinion as to that property's value. *See, e.g., In re Smith*, 313 B.R. 785, 791 (Bankr. N.D. Ind. 2004); *see also* Barry Russell, *Bankruptcy Evidence Manual* § 701:2 (2013–14) ("Courts have generally held that an owner is competent to give his opinion on the value of his property, often without stating a reason."). For some courts, this appears to be a rule of convenience, presuming the requirements of FRE 701 have been satisfied through that ownership. Nothing in FRE 701 speaks to the witness's ownership, however, only to whether that testimony is "rationally based on the witness's perception." FRE 701(a); *Syed*, 238 B.R. at 144.

In this instance, neither the Debtor nor Peck testified wholly as their opinion based on personal knowledge, but rather the Debtor testified that her opinion was in part based on her recollection but also based on her independent research. Tr. 77, 82-83, Mar. 11, 2014. The Debtor also, at certain points, seemed to be forming her testimony based on the contents of the spreadsheet (not using it to refresh her recollection). Tr. 74-75, Mar. 11, 2014. Peck testified that he had prepared the spreadsheet based in part on the Debtor's recollection, Tr. 140, Mar. 11, 2014, but primarily based on his own internet research. Tr. 140-142, Mar. 11, 2014.

Peck is neither the owner of the Property nor, presumably, could he have been qualified as an expert, and his testimony was not based on his personal knowledge. His testimony, which in the main consisted of his opinion as to value, is not admissible under FRE 701 and is therefore patently inadmissible. *AnchorBank*, 2011 WL 679343 at *3; *Syed*, 238 B.R. at 144 (a lay witness's opinion testimony as to value "not based upon personal knowledge, but based upon a variety of different sources" is inadmissible). While the Debtor can lay claim to being the owner of the Property, to the extent that the Debtor's opinion was formed based on Peck's research (whether directly or through the spreadsheet prepared by Peck) and on her own research, that opinion is also not based on personal knowledge and is inadmissible under FRE 701. *Id.*

Finally, the spreadsheet itself is inadmissible. The spreadsheet primarily summarizes Peck's research, Tr. 142, Mar. 11, 2014, which is inadmissible per the foregoing discussion. As such, it cannot qualify as a summary when what it summarizes is inadmissible. *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009) ("1006 allows a party to present, and enter into evidence, a summary of voluminous writings, recordings, or photographs. This provision, however, is not an end around to introducing evidence that would otherwise be inadmissible; therefore, in applying this rule, we require the proponent of the summary to demonstrate that the underlying records are accurate and would be admissible as evidence.").

## FINDINGS OF FACT[5]

From the review and consideration of the procedural background, as well as the evidence presented at the Hearing (and in light of the court's evidentiary rulings above), the court determines the salient facts to be as follows, and so finds that:

A.    The Cervacs

(1)    The Plaintiff and the Debtor are sisters, daughters of the late Norma E. Cervac ("Norma").

(2)    In April 1999, Norma entered into a trust agreement (the "Trust Agreement") establishing Norma E. Cervac Living Trust (the "Trust Estate") and appointing the Debtor as trustee.

(3)    The Trust Agreement provided that, upon Norma's death, the Debtor, as trustee, would administer the Trust Estate for the benefit of Norma's three children: the Debtor, the Plaintiff, and their brother, Joseph A. Cervac ("Joseph").[6]

(4)    Following Norma's passing in 2006, the Debtor liquidated the Trust Estate, resulting in total receipts of $234,859.80.

(5)    At some subsequent point, the Plaintiff and Joseph came to believe that the Debtor had failed to distribute to them their fair portion of the Trust Estate.

---

[5]    To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

[6]    Joseph did not participate in filing the Complaint in this Adversary.

B.   The State Court Action

(6)   In 2009, the Plaintiff and Joseph acted on their belief, filing a complaint against the Debtor in the Circuit Court of the Nineteenth Judicial Circuit, Lake County, IL (the "State Court"), Case No. 09 CH 0062 (the "State Court Complaint").

(7)   The State Court Complaint sought an accounting of the Trust Estate and damages stemming from the Debtor's misappropriation of Trust Estate assets.

C.   The Property and the Transfer

(8)   At some point prior to the entry of the State Court Judgment, the Debtor took to storing items of personal property in storage units.

(9)   There existed three storage units, containing personal property from the Debtor's former home and consisting of items the Debtor's family had accumulated, including artwork, furniture, various pieces of porcelain, silverware and flatware, and miscellaneous household goods.

(10)  A sculpture (the "Highstein") by Jene Highstein, an American abstract sculptor, was also in the storage units. The Highstein was a 400 to 500 pound steel or iron sculpture that was displayed in the Debtor's home before being placed in storage.

(11)  The Debtor, however, defaulted on her rental payments for the three storage units.

(12)  The Debtor's daughter, Alison Darnay ("Darnay"), used money from her father to pay the back-due rent on the storage units.

(13)  At that time, the storage units were transferred into Darnay's name. The units stayed in Darnay's name for approximately one week.

(14)  During that week and before the entry of the State Court Judgment, possession of certain items in the storage units – the Property – was transferred to the Plaintiff.

(15)  The Debtor was not present at the Transfer. Upon the decision of the Debtor, various family members including Samuel Littman, the Debtor's son, helped the Plaintiff move the Property out of the storage units and onto a moving truck. From there, the Property was taken to the Plaintiff's house and to a family friend's house, where the Property was being staged for sale.

(16)  The Highstein was not loaded onto the moving truck during the Transfer, and was, instead, left by a dumpster at the storage facility by Samuel Littman. What happened to the Highstein after that is unknown.

(17)  After the Transfer was completed, the units were closed.

D.   The State Court Judgment

(18)   On December 10, 2009, the State Court Judgment was entered against the Debtor in the State Court Action.

(19)   The State Court Judgment provided that the Debtor owed the Plaintiff $49,541.60.

(20)   Per the State Court Judgment, this amount consists of "reimbursement for (a) improperly disbursed estate funds in the amount of $21,286.60, (b) attorney fees and costs in the amount of $13,955.00, (c) an outstanding loan in the amount of $14,000, and (d) $300.00 for landscaping services."

(21)   The  State Court Judgment provides that the Debtor must make total restitution to the Plaintiff and Joseph within two years of the State Court Judgment's entry.

(22)   The State Court Judgment further provides that the Debtor must allocate twenty percent of her net monthly income to the restitution payment.

(23)   The State Court Judgment further provides for the Debtor to sell, with certain delineated exceptions, whatever assets she may have to satisfy the terms of the State Court Judgment.

(24)   The State Court Judgment makes no mention of the Transfer.

E.   The Disposition of the Property

(25)   After the Transfer, Leslie Hindman Auctioneers ("Hindman") was hired to conduct three auction sales of the Property.

(26)   Hindman successfully sold virtually all of the Property taken to the family friend's house that was staged for sale, upon which the Plaintiff received $3,493.68 in total net sales proceeds.

(27)   The Plaintiff also sold some silverware and dishes, resulting in net proceeds of $1,000.00.

(28)   The Plaintiff also received $1,527.00 from multiple garage sales of the Property.

(29)   All dispositions took place prior to the Petition Date.

(30)   What remains of the Property is stored at the Plaintiff's home.  Though the Debtor seeks return of the remaining Property and the Plaintiff seeks to have the Debtor retrieve it, as of the date of the entry of this decision and for reasons unknown to the court, that transfer has not occurred.

F.   Other Satisfaction of the State Court Judgment/Collection

(31)   On January 18, 2011, the Debtor assigned her interest in two asbestos-related settlement agreements to the Plaintiff and Joseph.

(32)   As a result, the Plaintiff received the Debtor's one-third interest in a settlement with Fibreboard, in the amount of $1,759.89.

(33)   As a result, the Plaintiff also received the Debtor's one-third interest in a settlement with Pfizer, in the amount of $2,7011.11.

(34)   The foregoing settlement payments were net of attorneys' fees incurred.

(35)   The Debtor has also paid to the Plaintiff directly, the following amounts:

    a.   $200 by cashier's check on November 8, 2011;

    b.   $200 by cashier's check on November 21, 2011; and

    c.   $300 by cashier's check on December 30, 2011.

(36)   Other than the preceding, the Debtor did not take the actions required by the State Court Judgment.

(37)   Despite the Debtor's failure to comply with the State Court Judgment, the Plaintiff did not attempt other collection from the Debtor in the nearly two years between the entry of the State Court Judgment and the filing of the underlying bankruptcy case.

## ISSUES PRESENTED

The Debtor's counsel in this matter have been presented with a difficult scenario. After their client, acting *pro se*, failed to abide by deadlines established by the court and failed to appear and defend the Motion for Summary Judgment, only then did she retain replacement counsel for counsel who had withdrawn months earlier. The Debtor's counsel has sought valiantly to avoid the consequences of their client's actions, and in so doing, has been forced to "argue from the hip," so to speak. Some of those arguments, while creative, do not evoke any cognizable legal claim. Those that do are addressed here. Those that do not are rejected, whether or not discussed herein.[7]

Given the *pro se* status of the Debtor at an integral part of this case, and given also the difficult task faced by the Debtor's counsel, the court has done its best to identify cognizable claims in the Motion to Vacate. Those claims fall into two categories: Those that seek to invalidate this court's grant of summary judgment on procedural or other grounds; and those that seek in the alternative to modify the court's grant of summary judgment to offset against it by alleged satisfaction.

The court will consider each in turn, below.

---

[7]   In actuality, the Debtor continued to advance new arguments throughout the matter. At the Hearing and in her post-trial briefing, for example, the Debtor adduced an alternative theory that the State Court Judgment should not be respected as it was procured through moral duress. Tr. 164-68, Mar. 12, 2014. As evidence of this theory, the Debtor's counsel adduced testimony regarding the Plaintiff's ongoing harassment of the Debtor. *Id.* The duress defense is discussed in further detail, below.

AUTHORITY AND
STANDARD OF REVIEW

A.   Civil Rule 59 and Civil Rule 60(b)(1)

Civil Rule 59 provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2).  Civil Rule 59 also authorizes motions to alter or amend a judgment. Fed. R. Civ. P. 59(e).

Civil Rule 60(b) provides, in pertinent part, that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (1) mistake, inadvertence, surprise, or excusable neglect ...." Fed. R. Civ. P. 60(b)(1).

Both Civil Rule 59(a)(2) and Civil Rule 60(b)(1) have as their essential purpose creating a way, other than by appeal, for the court to correct mistakes in a judgment entered. *Russell v. Delco Remy Div. of Gen. Motors Corp.,* 51 F.3d 746, 749 (7th Cir. 1995) (Rule 59 "essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings."); *Mendez v. Republic Bank,* 725 F.3d 651, 659 (7th Cir. 2013) ("Rule 60(b) allows a district court to correct its own errors that could be corrected on appeal, at least if the motion is not a device to avoid expired appellate time limits.")

In order to succeed on a Civil Rule 59(e) motion, a party bears the burden of clearly establishing a manifest error of law or newly discovered evidence. *LB Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263, 1267 (7th Cir. 1995).  Civil Rule 59(e) is not the appropriate avenue for presentation of theories and arguments that could and should have been presented before the entry of the order that the party is now seeking to have altered. *Id.*  A party seeking relief under Civil Rule 60(b) also bears the burden of establishing that the grounds for such relief exist. *Nat'l Bank of Joliet v. W. H. Barber Oil Co.,* 69 F.R.D. 107, 109 (N.D. Ill. 1975).

B.   Civil Rule 60(b)(5)

Civil Rule 60(b)(5), however, is more express in its application.  It provides, in pertinent part, that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

Fed. R. Civ. P. 60(b)(5).

Therefore, to obtain relief from a judgment under Civil Rule 60(b)(5), a party must prove that the judgment is completely satisfied, so that there is no need for the judgment to continue in

effect, or "where a judgment has not been completely satisfied, equity may nonetheless counsel in favor of relief under the final provision of Rule 60(b)(5)." *Sierra Club v. U.S. Dep't of Agric.*, 94-CV-4061-JPG, 2013 WL 811672, at *4 (S.D. Ill. Mar. 5, 2013) (*citing Horne v. Flores*, 557 U.S. 433, 454 (2009)).

Under Civil Rule 60(b)(5), and upon a party's motion, a court may relieve that party from judgment on the ground that the judgment has been satisfied, as one party may not receive double satisfaction. *Sunderland v. City of Philadelphia*, 575 F.2d 1089, 1090 (3rd Cir. 1978). When a party is bound to pay a judgment entered against it, "the fact that such payment is made *prior* to the judgment should not operate to allow the plaintiff to recover twice." *Torres-Troche v. Municipality of Yauco*, 873 F.2d 499, 501 (1st Cir. 1989).

However, "[g]enerally, the only way in which a money judgment can be satisfied is by payment in money unless the parties agree otherwise." *Home State Bank/Nat'l Ass'n v. Potokar*, 249 Ill.App.3d 127, 131 (2d Dist. 1993) (*citing Heller v. Lee*, 130 Ill.App.3d 701, 702 (3d Dist. 1985)). "Whether an agreement to satisfy a judgment has been concluded is a question of fact for the trial court." *Id.* (*citing Russell v. Klein*, 33 Ill.App.3d 1005, 1008 (1st Dist. 1975)).

To modify the Judgment Order, based on the State Court Judgment, an agreed order, to avoid inequities, the movant "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *United States v. Krilich*, 303 F.3d 784, 789-90 (7th Cir. 2002) (*citing Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992)). The movant may meet this burden "by showing a significant change either in factual conditions or in law." *Id.* (*citing Rufo*, 502 U.S. at 384).

## DISCUSSION

As noted above, the Debtor's arguments essentially fall into one of two categories: those that seek to invalidate this court's grant of summary judgment on procedural or other grounds; and those that seek in the alternative to modify the court's grant of summary judgment to offset against it alleged satisfaction. The court considers each, in turn.

A.   Challenging the Propriety of the Orders

1.   *"Default" on Summary Judgment*

As noted above, this is the second of the Debtor's attempts at vacating the Orders. In the first, the Debtor sought to vacate the Orders solely on the grounds of excusable neglect. *See* Fed. R. Civ. P. 60(b)(1). For the reasons discussed above, that argument was not well taken.

Nonetheless, the Debtor renews that argument in the Motion to Vacate. Taken together, each of the motions appears to question whether the court's action, in ruling on the uncontested Summary Judgment Motion, was authorized.

There is a both a conceptual and practical difference between defaulting a party and ruling on an unopposed motion. Defaulting a party involves accepting as true uncontroverted allegations in a complaint, *see* Fed. R. Civ. P. 8(b)(6), without further inquiry except perhaps by way of calculating judgment in a default judgment. *See, e.g.*, Fed. R. Civ. P. 55(b)(2); *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). Summary judgment, on the other hand, involves a critical inquiry of the court

into the facts, whether or not that summary judgment is opposed. *See, e.g., Heinemann v. Satterberg,* 731 F.3d 914, 916-17 (9th Cir. 2013) (discussing in great detail the history of revisions to Civil Rule 56 and advisory notes to the same, and concluding that present Civil Rule 56 requires the court inquire into merits on unopposed summary judgment motions).

Even though the latter requires an independent inquiry, failing to respond is, however, not without consequences. Civil Rule 56 places affirmative obligations on a party opposing summary judgment. Fed. R. Civ. P. 56(e). Those parties may not simply rest on their answer, as the Debtor's argument implies. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.") (quotations omitted).

While failure to oppose a summary judgment motion does not, as *Heinemann* makes clear, result in an automatic win for the movant, *Strong v. Wisconsin,* 544 F.Supp.2d 748, 759-60 (W.D. Wis. 2008) ("Even when a motion for summary judgment is unopposed and the facts are undisputed, the moving party must still show that he 'is entitled to judgment as a matter of law.'"), it does mean that the court must conduct its critical inquiry without the benefit of the insight and argument of one of the parties.

In the matter at bar, the court did not default the Debtor. That is self-evident in the Orders themselves, wherein the court declined, based on the express terms of the State Court Judgment and the nature of the obligations in it, to grant summary judgment on all of the relief requested by the Plaintiff. That the Debtor now raises a host of arguments as to how the court might have differently interpreted the facts and law before it on summary judgment is unavailing.[8]

These arguments do not meet the standard for relief under either Civil Rule 59 or 60. The Debtor has not proven that the court made a manifest error of law in granting summary judgment on an unopposed basis, that there was newly discovered evidence that justifies amending the Orders, or that there was a mistake in the Orders. Instead, the Debtor merely offers an alternative theory of factual interpretation, one that this court did not and does not adopt. *See also U.S. Bank Nat. Ass'n v. Verizon Communications, Inc.,* No. 13-10752, --- F.3d ----, 2014 WL 3746476, at *14-15 (5th Cir. July 30, 2014) (setting forth standards for a court to consider when asked to vacate a grant of summary

---

[8]     For example, the Debtor argues that the court erred, when taking together all that was before it (including, among others, the Complaint, Answer, the State Court Judgment and all of the affidavits and other documents submitted in support of the Summary Judgment Motion), in concluding that the defalcation required for § 523(a)(4) had been established, even though the Debtor admitted the same in the Answer itself. Though the Debtor argues that this is solely a legal conclusion and the Answer has no bearing, it is not. The question turns on the facts, and thus required opposition under Civil Rule 56(e). The uncontroverted facts before the court overwhelmingly established that funds were not disbursed as required, and that failure was the result of the Debtor's using those funds for her own personal use and benefit. Taken together, more than enough facts were extant for the court to reach the conclusion that the elements of § 523(a)(4) had been satisfied.

This argument, in the court's view, is precisely the kind of argument that should have been advanced in opposition to the Summary Judgment Motion, and to allow this argument now would require the court to disregard uncontroverted facts, and would put paid to the requirements in Civil Rule 56(e) as applied by the Supreme Court in *Liberty Lobby. Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.

judgment, none of which are satisfied here). Additionally, as the Debtor had not presented such theories of interpretation prior to the entry of the Orders, and because the Seventh Circuit has warned parties as to the use of Civil Rules 59 and 60 for new legal theories, the court will not indulge such theories. *Caisse Nationale de Credit Agricole v. CBI Indus.*, Inc., 90 F.3d 1264, 1270 (7th Cir. 1996).

### 2.    *Challenges to the State Court Judgment's Validity*

The Debtor challenges the validity of the Orders by challenging the validity of the State Court Judgment. This is done in two ways: First, the Debtor argued and presented testimony in the Hearing that the State Court Judgment was procured through duress. Second, the Debtor argues that the State Court Judgment was satisfied by the Transfer *before* the State Court Judgment was entered by the State Court.

Before considering these challenges, the court must address a more fundamental question that the parties did not address in their filings, the application of the *Rooker-Feldman* doctrine.

### a.    The Rooker-Feldman *Doctrine*

Whenever a party asks a federal court to consider the validity of a state court order, it is incumbent upon the federal court to consider the application of the *Rooker-Feldman* doctrine. *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 416 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983) (together holding that federal courts do not have subject-matter jurisdiction to review state court decisions).[9]

Neither party has addressed *Rooker-Feldman* in their filings. As *Rooker-Feldman* is, however, jurisdictional in nature, *In re Fischer*, 483 B.R. 877, 882 (Bankr. E.D. Wis. 2012) (*citing Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)), the court must address it nonetheless.

If the Debtor's arguments invite the bankruptcy court to consider elements that were either properly before the State Court or which should have been raised in that litigation before entry of the State Court Judgment, *DeBenedictis v. Blitt & Gaines*, No. 10 C 922, 2010 WL 2836804, at *3 (N.D. Ill. July 19, 2010) ("*Rooker-Feldman* applies not only to claims that were directly raised in state court, but also to claims that are 'inextricably intertwined' with a state-court judgment.") (*citing Kelley v. Med–1 Solutions, LLC,* 548 F.3d 600, 603 (7th Cir. 2008)), those arguments may fall outside of this court's jurisdiction.

---

[9]    *Cf.* 28 U.S.C. § 1738 ("The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form. Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."). "The *Rooker–Feldman* doctrine does not displace § 1738 and turn all disputes about the preclusive effects of judgments into matters of federal subject-matter jurisdiction." *Freedom Mortg. Corp. v. Burnham Mortg., Inc.*, 569 F.3d 667, 671 (7th Cir. 2009).

The propriety of entering a judgment under the law before the trial court is unquestionably inextricably intertwined with the entry of the judgment by the trial court itself.[10] As the district court in this District has made clear, arguments of this nature, essentially challenging the validity of a state court judgment, "cannot be separated from the state court's judgment." *Manly v. Illinois Dept. of Healthcare and Family Services*, No. 09 C 7298, 2010 WL 5157970, at *4 (N.D. Ill. Dec. 14, 2010).

Further, court orders, if plain on their face, are afforded their plain language meaning in enforcement. *Grede v. FCStone, LLC*, 746 F.3d 244, 256-57 (7th Cir. 2014) (disagreeing with assertion that consideration of the transcript of court proceedings underlying order would assist in interpreting otherwise clear order text). As the Seventh Circuit stated:

> Relying on the hearing transcript rather than the text of the resulting court order to decide what the order meant can raise serious problems. Parties and non-parties alike should be able to rely on the text of a court order where the text is clear, rather than having to dig through the docket and record to determine the order's true meaning.

*Id.* at 257 (citation omitted); *see also In re Rockford Prods. Corp.*, 741 F.3d 730, 734 (7th Cir. 2013).

In *Rockford Products*, the Seventh Circuit went further, stating that "[t]he Supreme Court has told us to use simple, clear rules for jurisdictional boundaries. Treating ambiguous language in an opinion as the basis of a tea-leaf reading is some distance from a simple and clear rule." *Rockford Products*, 741 F.3d at 734 (*citing Hertz Corp. v. Friend*, 559 U.S. 77, 94-95 (2010); *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 99 (1994); *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202 (1988)).

Taken together, both *Grede* and *Rockford Products* direct the trial courts in the Seventh Circuit not to resort to *parol* evidence in interpreting unambiguous orders.[11]

With this in mind, the court considers each of the Debtor's arguments.

b.      *Duress*

Here, the Debtor argues that the State Court Judgment was the product of duress. The Debtor testified that she had been harassed by the Plaintiff to a point where she felt she needed to agree to the resolution in order to make the harassment stop. Tr. 45, Mar. 11, 2014.

---

[10]    The fact that the State Court Judgment was an agreed order has no bearing on whether the *Rooker-Feldman* doctrine applies to it. *Rooker-Feldman* applies to default judgments as well as to judgments on the merits, *In re Sabertooth, LLC*, 443 B.R. 671, 683 (Bankr. E.D. Pa. 2011), and thus it should not matter whether the State Court actually addressed the merits of the parties' disputes, only whether those merits were properly before it.

[11]    The *parol* evidence rule is a principle of contract interpretation that holds parties to the express language of a contract, without reference to oral or other extrinsic evidence, when the contract is unambiguous. *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill.App.3d 874, 878 (2d. Dist. 2004) ("[I]f the language is unambiguous, then the trial court interprets the agreement without resort to *parol* evidence.").

As per the earlier discussion, however, this is a question that was properly before the State Court when it entered the judgment. The propriety of entering an order must be considered by a court at the time of entry. As such, the Debtor's duress argument falls outside the court's jurisdiction.

If the question of duress were within this court's jurisdiction, the argument would nonetheless have failed for two essential reasons.

First, nothing filed by the Debtor prior to the Hearing gave any clear indication that the Debtor would seek to collaterally attack the State Court Judgment by arguing that it was procured through duress, but that is in fact what the Debtor did at the Hearing. Words such as "duress" and "bullying," which were raised frequently in the Hearing, were conspicuously absent from the Debtor's pre-Hearing filings.

In the court's view, adding new arguments after briefing is essentially complete is inappropriate. It denies the opposing party a full and fair opportunity to respond, and is generally precluded by the applicable rules. See, e.g., Fed. R. Civ. P. 8(c)(1) (requiring a party to raise the affirmative defense of duress "in responding to a pleading"). The purpose of Civil Rule 8(c)(1) is to give the plaintiff adequate notice of the defenses so that the plaintiff may address them in trial. *Super 8 Worldwide, Inc. v. Am. Lodging Partners, Inc.*, No. 08-CV-4514, 2011 WL 248447, at *4 (N.D. Ill. Jan. 25, 2011) (*citing Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1377 (7th Cir.1990)). Failure to include such affirmative defenses in an answer or to raise them in a timely manner so as prejudice the plaintiff results in a waiver of such defenses. *Id.* (*citing Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir.1991)). As the Debtor failed to afford the Plaintiff a full and fair opportunity to consider and respond to this argument, the court would not have considered the argument even if it had the jurisdiction to do so.

Second, the duress argument was simply not developed sufficiently. While the Debtor made much of the Plaintiff's silence for two years after the entry of the State Court Judgment, inviting the court to conclude that the alleged harassment had had its desired effect, the testimony was, at best, ambiguous regarding any duress the Debtor might have felt in entering into the State Court Judgment. Tr. 46-47, Mar. 11, 2014. And the existence of harassment is not necessary to explain the Plaintiff's actions. In the court's view, the Plaintiff's silence was consistent with the terms of the State Court Judgment as it, by its terms, could not be enforced until such time as two years had passed with noncompliance. As such, had the court the jurisdiction to do so, it would have rejected the Debtor's duress argument on its merits. *Accord Mickelson v. Mickelson*, No. 11 C 5061, 2013 WL 3774004, at *9-10 (N.D. Ill. July 18, 2013) (denying a defense on very similar arguments made without evidentiary support and subsequent acts to the contrary).

    c.    *Accord and Satisfaction*

Here, the Debtor argues that the Transfer itself was an accord and satisfaction of the underlying obligation between the Debtor and the Plaintiff.[12]

---

[12]    Unlike duress, the question of whether accord and satisfaction might apply was evident in the Debtor's filings made before the Hearing, in all but name. As a result, once the Debtor's counsel articulated

16

This argument is contrary to the plain language and logical import of the State Court Judgment. There is no logical interpretation of the State Court Judgment that does not result in the conclusion that on that date of the judgment, the Debtor owed the Plaintiff the amounts set forth therein. It would be meaningless for a court to enter an order memorializing an obligation that had previously been satisfied.

Put in other terms, what this argument and the duress argument invite this court to do is conclude that the State Court erred when it entered the State Court Judgment. Whether the State Court erred in entering the State Court Judgment despite the existence of the duress or the Transfer is "inextricably intertwined" with the State Court Judgment itself. *Med–1 Solutions*, 548 F.3d at 603. That is simply not reviewable in the federal courts, and the Debtor's arguments in this regard are therefore rejected on jurisdictional grounds.

As was the case with the duress argument, even if the court were to consider this argument on its merit, it would fail. The essential doctrinal requirements of accord and satisfaction are missing in the matter at bar. Even the briefest of inquiries into the law of accord and satisfaction bears this out.

Under Illinois law, "an 'accord and satisfaction' is an agreement between parties which settles a *bona fide* dispute over an unliquidated sum." *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 255 (Bankr. N.D. Ill. 1990) (Schmetterer, J.). In order to prove an accord and satisfaction exist, a party must prove by a preponderance of the evidence: (i) "a dispute between the parties"; (ii) "a tender with the explicit understanding of both parties that it was in full payment of all demands"; and (iii) "an acceptance by the creditor with the understanding that the tender is accepted in full payment." *Id.* (citing *Polin v. Major*, 150 Ill.App.3d 854, 856 (1st Dist. 1986); *Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.*, 103 Ill.App.3d 380, 383-84 (2d Dist. 1982); *W.E. Erickson Construction, Inc. v. Congress–Kenilworth Corp.*, 132 Ill.App.3d 260, 269 (1st Dist. 1985), *aff'd*, 115 Ill.2d 119 (1987)). The Debtor has not shown that there is an objective basis for either a factual or a legal dispute as to the validity of a debt. *W. Side Cmty. Hosp., Inc.*, 112 B.R. at 253 (citing *In re Busick* 831 F.2d 745, 750 (7th Cir. 1987)). Mere assertion of the existence of a dispute, however, does not establish it. *Sherman v. Rokacz*, 182 Ill.App.3d 1037, 1045 (1st Dist. 1989).

As such, had the court the jurisdiction to do so, it would also have rejected the Debtor's accord and satisfaction argument on its merits.

B.    Relief under 60(b)(5)

The Debtor's argument that the post-Transfer, post-judgment dispositions of the Property were not appropriately credited by the Plaintiff to the State Court Judgment after its entry is not, however, similarly barred.

The question of satisfaction of judgments after their entry is frequently before this court. Such is not an inquiry regarding the propriety of a judgment itself, and asks only about a party's compliance after the fact. Illinois law provides a mechanism similar to Civil Rule 60(b)(5) for just

---

the theory in the Hearing, the court permitted both parties to address accord and satisfaction in subsequent supplemental briefing.

this purpose, and provides that such an inquiry "is not a continuation" of the prior proceeding. 735 ILCS 5/2-1401(b) (providing that in petitions for relief from judgments, "[t]he petition must be filed in the same proceeding in which the order or judgment was entered but is not a continuation thereof"). As such, the *Rooker-Feldman* doctrine does not prevent this court's review.

As discussed above, the Debtor failed to show that the Transfer was an accord and satisfaction of the debt underlying the State Court Judgment. No alternative theory regarding the nature of the Transfer itself is proposed, and the court need not presume one here.[13]

It is clear from the parties' actions toward the Property post-Transfer that the Debtor remained the owner of the Property. The State Court Judgment references that the Debtor "is ordered to sell whatever assets she may have to satisfy" the debt. The Plaintiff applied the proceeds of any sales of the Property to the obligations owed by the Debtor. Tr. 305, Mar. 12, 2014. Both parties accept that proceeds of the sales of the Property should be applied to the obligation. In so doing, both parties implicitly accept that the Property remains the Debtor's, even though in the possession of the Plaintiff.

There remains only a few open questions, therefore with respect to this argument. First, *how* should the proceeds and other payments be applied? Second, should the Debtor's arguments regarding the Highstein sculpture have any effect? Third, what should the court do, if anything, regarding the Debtor's allegations that the sales of the Property were for less than appropriate value? And last, what remains owing?

1.   *Application of the Proceeds of the Sales/Prepetition Payments*

As the effect of the Orders to is bifurcate the debt the Debtor owes to the Plaintiff into dischargeable and nondischargeable obligations, should the proceeds of the sale be applied to the nondischargeable portion of the debt, the dischargeable portion of the debt, or to each by some ratable method?

This is a question of state, not federal, law. *In re Corradini*, 276 B.R. 571, 575 (Bankr. W.D. Mich. 2002) ("The Bankruptcy Code does not direct how payments are to be applied against a

---

[13]     One thing is clear that the Transfer itself was not a change in ownership. For it to be so, it would either have to be the accord and satisfaction the Debtor wishes (and which it clearly cannot be), or a payment by the Debtor of her obligations, net of those contained in the State Court Judgment. As to the latter, if the court could conclude that the Debtor owed the Plaintiff much more that what was contained in the State Court Judgment, it might further conclude that after application of the Transfer, what remained was what was set forth in the State Court Judgment. This conclusion would have an elegant application to the disputes at bar, as it would allow the court to ignore the questions raised by the Debtor regarding the value of the Property. The court could reach this conclusion, find that the value is immaterial to any consideration before the court, deny the Motion to Vacate, and move on.

This conclusion, however, is not supported by the facts before the court. The total indebtedness alleged in the State Court Action would be, at least in the Debtor's view, greatly exceeded by the value of the Property in the Transfer. Assuming that the State Court Judgment was net of the Transfer is as inconsistent with the facts as is the Debtor's position that the Transfer satisfied the State Court Judgment prior to its entry. Nor does the subsequent sale of the Property and application of the proceeds to the obligation support the Debtor's argument in this regard, as discussed above.

debt."). When determining how to apply prepetition payments when a debtor has a nondischargeable claim and a dischargeable claim held by the same creditor, the court must therefore examine the state law regarding application of payments. *Id.*

Under Illinois law, a debtor may direct application of a payment to a certain portion of a debt before the payment is made. However, if a debtor fails to provide instructions regarding the payment, "[t]he doctrine of equitable application of payments allows a creditor to apply payments received from a debtor, without instructions on how to apply the payments, to any account the creditor chooses." *Horbach v. Kaczmarek*, 915 F. Supp. 18, 24 (N.D. Ill. 1996) *aff'd*, 288 F.3d 969 (7th Cir. 2002).

Where multiple debts are owed and payment is made to a creditor without any direction from a debtor as to which debt to apply the payment to, the creditor has "a right to apply these payments in a way most beneficial to themselves and so as not to extinguish" any debt for which the debtor remains accountable. *United States v. Giles*, 13 U.S. 212, 241 (1815); *Airtite, A Division of Airtex Corp. v. DPR Limited P'ship*, 265 Ill.App.3d 214, 220 (4th Dist. 1994) (allowing application of payment to portion of unsecured debt rather than secured debt).

The court concludes therefore that the proceeds of the sale of the Property and the other prepetition payments must be first credited against dischargeable portion of the debt, as requested by the Plaintiff in her filings.

2.    *Effect of the Debtor's Arguments with respect to the Highstein Sculpture*

As noted in the court's factual findings above, at the time of the Transfer, a potential valuable sculpture by Jene Highstein was mislaid. The Highstein was a 400 to 500 pound steel or iron sculpture that was displayed in the Debtor's home before being placed in storage and was believed by the Debtor to be worth $75,000. Tr. 477, Mar. 19, 2014.[14]

The problem with this request is twofold. First, as noted above, the only logical conclusion regarding the Transfer is that it did *not* change the ownership of the Property. As such, the Highstein was the Debtor's before, during and after the Transfer. Nothing in the Transfer evidences the Plaintiff taking on any responsibility for this item, and thus the court fails to see how the loss of the Highstein is on the Plaintiff's account.

Further, the record clearly reflects that it was the Debtor's agent Samuel Littman (her son) that caused the Highstein to be mislaid. Tr. 247, 250, Mar. 12, 2014. He was at the Transfer representing the Debtor, not the Plaintiff. Tr. 169, Mar. 12, 2014. It was Mr. Littman who failed to

---

[14]    The value of the Highstein sculpture was never established. In her proposed findings of fact and conclusions of law, the Debtor asserted that the Debtor was unable to testify as to the value of the Highstein sculpture because her counsel's interrogation was interrupted by objections of Plaintiff's counsel. Regardless of the circumstances, it was the Debtor's obligation to ensure that an essential element of her case was proven. Failing that, the Debtor then attempted to establish the $75,000 value via a motion to reopen the Debtor's main bankruptcy case to file an affidavit from the Debtor as to the value. That motion was denied. Ultimately, given the court's rulings on those objections in today's decision, it matters not.

load the Highstein and who left it next to the dumpster. While it was unclear who told him to do
so, Tr. 175-176, Mar. 12, 2014, it was on the Debtor's account, not the Plaintiff's, that he acted.

As such, it is the court's conclusion that the Debtor is due no credit for the loss of the
Highstein.

3.     *The Sales of the Property*

In the Motion to Vacate, the Debtor also attempts to challenge the sales of the Property that
took place after the Transfer. Nothing, however, offered by the Debtor, leads the court to equate
her unhappiness with the result with any actionable right against the Plaintiff.

The testimony presented to the court made clear that both the retention of Hindman and
the sales of the Property were, if not explicitly approved by the Debtor, never objected to at the
time. Tr. 297, Mar. 12, 2014. While the Debtor casts aspersions at the qualifications of Hindman,
nothing offered by the Debtor other than her opinion – one clearly founded in the result she seeks –
calls into question Hindman's credentials. Tr. 89, Mar. 11, 2014. In fact, Hindman is known to the
court. To date, the court has not had cause to question Hindman's qualifications or results and the
Debtor gives the court no reason to here.

Further, the testimony made it clear that the Debtor was fully informed regarding the sales
that took place. Tr. 90, Mar. 11, 2014. No evidence was offered that the Debtor objected to the
method or results of those sales at the time. While the Debtor now wishes to rewrite history so that
these dispositions of the Property are somehow revalued and credited against the obligation owed by
the Debtor for more than the sales generated, the Debtor offers no legal theory on which such a
revaluation would be based.

As such, the court finds no reason to question the results of the sales and will apply those
results in the manner discussed above.

4.     *What Remains*

What remains is twofold. First, the sale proceeds applied and other payments made must be
applied to the obligation, first to the dischargeable portion and then, if applicable, to the
nondischargeable portion. Second, the disposition of the Property remaining in the Plaintiff's
possession must be determined.

a.     *Calculating the Remaining Obligations*

As previously discussed, the Plaintiff in this case has the right to apply all prepetition
payments and transfers to the dischargeable portion of the debt first, and then to the
nondischargeable portion of the debt. As noted above, the State Court Judgment provided that the
Debtor owed the Plaintiff $49,541.60, consisting of "reimbursement for (a) improperly disbursed
estate funds in the amount of $21,286.60, (b) attorney fees and costs in the amount of $13,955.00,
(c) an outstanding loan in the amount of $14,000, and (d) $300.00 for landscaping services."

This court's Judgment Order provided that the first two elements of the State Court
Judgment were nondischargeable, in the total amount of $35,241.60. While the Judgment Order
does not provide the amount of the dischargeable obligation, simple math dictates that that amount

is $14,300.00. Given the foregoing, the court must therefore find that the value of the prepetition payments and transfers exceeded $14,300.00 in order for the court to amend the Summary Judgment Order.

The amounts found by the court to be received are as follows:

| | |
|---|---|
| Sale of Property at friend's house | $3,493.68 |
| Sale of silverware and dishes | $1,000.00 |
| Garage sales | $1,527.00 |
| Fibreboard settlement | $1,759.89 |
| Pfizer settlement | $2,701.11 |
| Checks of $200, $200 and $300 | $700.00 |
| **Total:** | $11,181.68 |

The total of $11,181.68 is less than the $14,300 dischargeable portion of the Plaintiff's claim.[15] There is therefore no amount to be applied against the nondischargeable obligation and, as such, the Judgment Order correctly finds that the Debtor owes the Plaintiff $35,241.60 as a nondischargeable obligation.

Last, what is also owed by the Plaintiff to the Debtor is the return of what remains of the Property. The evidence offered by the Plaintiff is that she does not want the Property and her landlord wants it removed. Tr. 264, Mar. 12, 2014. Given the ruling of the court in this Memorandum Decision, that Property continues to be owned by the Debtor. Whatever Property remaining in the Plaintiff's possession must be claimed by the Debtor or the chapter 7 trustee on behalf of the estate, or deemed abandoned.[16]

Given what has transpired, 21 days from the date of entry of the order issued in conjunction herewith should be more than sufficient. Any Property not claimed by the Debtor or the chapter 7 trustee in that period will be deemed abandoned, and may be disposed of by the Plaintiff in any manner she sees fit without need of further order of this court.

---

[15]   It should be noted that the Debtor alleges that she should receive credit for the full amount of any of the sales and the full amount of the Asbestos Claims, without any reduction for the costs associated therewith. That is nonsense. The only way that would be appropriate is if the other parties had agreed to bear the Debtor's portion of the costs (or, perhaps, under the rejected accord and satisfaction theory). No evidence was offered in that regard and the Debtor has advanced no other cognizable theory under which she would be entitled to collect these amounts without paying the associated costs. As such, the Debtor is only entitled to credit for the net recoveries.

[16]   While the Debtor has argued that certain of the Property has been put to personal use by the Plaintiff, the Debtor has failed establish her claim of conversion in this regard. "In order to recover for conversion in Illinois, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (*citing Cirrincione v. Johnson*, 184 Ill.2d 109 (1998)). The Debtor has not shown the third element of this cause of action. In fact, the evidence provided shows that the Debtor has refused to reclaim the Property. Tr. 37, Mar. 11, 2014; 264, Mar. 12, 2014. As such, all the Property remaining in possession of the Plaintiff is property of the Debtor.

CONCLUSION

The Debtor has failed to advance any theory under which this court's previous orders should be vacated or otherwise modified.  As such, the Motion to Vacate is not well taken.

A separate order will be issued concurrent with this Memorandum Decision, denying the Motion to Vacate and setting for the foregoing obligations regarding the return of the Property remaining in the Plaintiff's possession.

Dated: September 11, 2014

_____
Timothy A. Barnes
United States Bankruptcy Judge